All rise. Eleanor Pettigrew, Fifth Division, is now in session. Honorable Justice Robert E. Gordon is presiding. Everyone may be seated. Good morning to all. Good morning, Your Honor. Where do you call the first case? First case number is 53-112, Gary Fitzgerald v. Thomas O'Donnell. If lawyers are going to argue the case, please approach the bench and introduce yourselves to the court. Good morning, Your Honor. Jack Lydon on behalf of the plaintiffs. Good morning, Your Honor. May it please the Court, James P. Nally on behalf of Thomas O'Donnell, appellee along with Richard Carbonaro. I'll be doing the argument on behalf of Mr. O'Donnell. And appellant, how much time do you want to reserve for rebuttal? A few minutes. Okay. All right. Well, let's proceed. May it please the Court, Jack Lydon on behalf of the plaintiffs. Your Honor, this matter comes before the Court this morning on an appeal from certain orders that entered a Rule 137 sanction against the plaintiffs in this case. I'm not going to belabor the facts of the case. I know that the Court is well-informed on that. Well, wasn't the sanction based on the facts of the case? Well, it certainly was. Well, then, I mean, is it your theory that there should not be sanctions? It is my theory that there should not be sanctions. That's right. Why? I believe that the sanction is not supported by the record. In other words, that the pleading itself, the allegation 46 in the third amendment complaint, was not in violation of Rule 136. In other words, was reasonably well-founded upon an investigation prior to filing. Well, let me tell us how you come to this conclusion. I come to this conclusion principally because at the outset of the case, the plaintiffs obtained a forensic analysis from a forensic document examiner that indicated that Thomas O'Donnell was the likely writer of the envelopes which contained the defamatory statements. That isn't what the expert testified to. The expert testified that in his opinion, that there were indications based on a range of a scale, a range of opinions that go from certain to uncertain, that there was indications that Mr. O'Donnell was in fact the writer, and based on that, the allegation in the complaint was made. In addition to that, there were... What about the other allegations? I mean, you had three amendment complaints, literally almost the same, each complaint, right? And the trial court dismissed and struck all of the complaints except for that one paragraph 46 that was based on the envelopes. The court dismissed all the other counts, left the one defamation count related to Mr. O'Donnell. There were other theories, other legal theories, other defendants in the case. But weren't they virtually all the same in the first amendment complaint, the original complaint, the first amendment, the second, third? Yes, except there were, from the original complaint, there were additional defendants added in the second complaint. But the substantive allegations were largely the same. That's correct, yes. You know, going back to this expert, it appears that the expert wasn't retained until after the complaint was filed. The expert was consulted before the... was engaged and hired and actually paid before... paid partially before the case was filed. There wasn't a report. There's a distinction and an argument in the plaintiff's brief that there wasn't a report. In fact, there was no written report in the way that there was in the 213 disclosures throughout the case. But that same expert was, in fact, reported... I'm sorry, was, in fact, retained and consulted before the filing of the case. I mean... Is there any pleading that you filed that said that you were told by this expert before you filed the complaint that the signature... that the signature belonged? There is. It's in the affidavit of Timothy Gibbons, which is contained in the record. It was filed in response to the motion for sanctions. It appears in the record, I believe, at page 798. And in that, in paragraph 22, it clearly indicates that before the filing, he did engage a forensic document examiner that indicated Mr. Gibbons... I'm sorry, Mr. O'Donnell was the likely writer of the envelopes. And that was the basis. The basis upon which the plaintiff, that plaintiff... But the expert never came out with that particular opinion. The expert qualified his opinion based on the standards, the range of standards, and it's a more defined and more particular standard. I'm sorry, it's a defined and more particular opinion that's contained in his 213 disclosure. But the question for the court is what was reasonable at the time of the filing of that complaint and what the plaintiff knew or should have known about the filing of the basis for the filing of the complaint at that time, when it was filed. This, interestingly, the defendant makes no mention of any of that. There's no discussion in their brief or even in the underlying court, and particularly in the opinion of the trial judge as to whether or not there was any consideration given to the affidavit of Mr. Gibbons. There's simply no discussion of it. And that really is the reason... I mean, you know, a good lawyer is not going to file a complaint after he retains an expert without having the paper to protect himself. I mean, what do you say about that? I say in hindsight it would have been good to have that written report, that writing from that expert, certainly so. But it doesn't negate the fact that that was done and not addressed by the court, not addressed by the defendants. But didn't the complaint indicate that you did have a handwriting analysis, that you had something to indicate that O'Donnell addressed the envelopes? Then it turns out once the expert's examined, he can't to any degree of certainty testify that it was him who signed those envelopes. So that's my question, two-part. Number one, in the Third Amendment complaint, did you not state that you had a handwriting analysis? It does say that, yeah, and I think that's what we had. Well, if you had a handwriting analysis, would it have behooved you before you filed this complaint to determine whether or not the expert was going to be able to say to a certain degree of certainty that it was O'Donnell's signature or handwriting on the envelope? And I think we did that. That was the indication, the report, the analysis we got from the expert witness. It just wasn't in a writing. It just wasn't provided in the same way the opinion was, the report was provided at the time of the expert disclosure during the course of discovery. But when the expert, he testified, did he not, the expert, in a deposition or something? Yes, he did. And in the expert, you know, in his deposition, he never gave an opinion based on a reasonable degree of certainty that that was the signature of O'Donnell. He gave an opinion based on the standards related to forensic document examination. That is a nine-point scale that it was more favorable than not, more probable than not, that standard that he used, the indication standard, is more probable than not that that was the writing of the expert. But that's not what he said. He said it may have. He didn't say that it was more probable than not. And he didn't say that it was a certain degree of certainty. He said it may have. Anyone in this room could look at that envelope and say the same thing. It may have or it may not have, right? I don't even think he got to the word may have. I'm sorry, say that again? I don't think he even concluded that it may have. I think he did say that in the deposition testimony. I think it's contained. Yeah, the way he put it was more of a possibility. His report, which is in the record, clearly indicates the nine-point standard and what the substance of his opinion was, what the basis of his opinion was, what the degree of certainty that his opinion was. It was only in his cross-examination at the deposition that the may have language was put into his mouth in a deposition transcript and then put in the motion for summary judgment. Clearly, in the motion for summary judgment, finding a denial of the trial judge, clearly she believed there was a question of fact related to that expert witness testimony and the handwriting on the envelopes and sent the case or denied the motion for summary judgment, effectively then sending the case to trial. So the basis, the reason we think this is just a fundamentally abusive discretion, fundamentally unreasonable decision is that she then, a few weeks later, turns around and finds that that allegation is blatantly false on the very same evidence. The very same evidence. One week she says, no, it's a question of fact. If you go either way, we'll have a trial of fact decided. A couple of weeks later, she says, no, it's blatantly false and it's sanctionable. They knew or should have known that it was false and are sanctioned. Clearly, that, from our position, indicates an abusive discretion, a decision that does not logically follow from the facts presented. Interestingly, the defendant makes no argument related to the motion for summary judgment. Much of what we say they just tend to ignore in their brief. But for those reasons, for that reason, we think that the sanction should be vacated and the ruling reversed. So that's the relief you're looking for, is that the sanction should be vacated? Yes, the sanction should be vacated. The orders related to the appeal, I'm sorry, the orders appealed from should be reversed.  Which orders? Those would be the orders of July the 8th and September the 28th. In another basis, another principle basis upon which the court, or for which the court should reverse these orders, is that there was simply no evidence in the record, simply no findings of fact, and no evidentiary hearing related to an improper purpose. As the court is well aware, there are two bases upon which to enter a 137th sanction, a subjectively untrue pleading, or a pleading interposed for an improper purpose. In this case, and in the July 8th order, there was an extensive hour-long argument in hearing before the trial judge on July the 8th. There was an order where she found a sanctionable basis on the objective untrue pleading point. Then in that order, as it was drafted by the defendant's counsel, there was also a written finding in there, a conclusory finding such as it was, that it was interposed for an improper purpose. That language was explicitly stricken by the court after discussion about the language in that order. Then, again, several weeks later at the hearing, there was a hearing related to the sanction amount. So there was a fee petition, there was a hearing on the amount,  and the court then also entered, in addition to a handwritten order related to the amount of the sanction, there was a typewritten order that the court had previously prepared, which then interposed or entered a sanction based on an improper purpose. There was no evidentiary hearing based on it. It was, there was no... No. I'm saying there was no evidentiary hearing based or to support the entry of a finding of an improper purpose that the Rule 137 sanction was entered because it was, the pleading was interposed for an improper purpose. There was no evidentiary hearing related to that. So on July 8th when the hearing was conducted, were counsels allowed to make arguments? Oh, yes. There was extensive argument. There were no witnesses. Was there a court reporter present? I do not believe there was a court reporter present. All right. Did you ever provide that the court, this court, were it any type of bystander's report or agreed statement of facts? No. That is not in the record. Why not? Well, I, principally because, at least from the standpoint of the plaintiffs, that because of the July 28th record, I'm sorry, the July 28th, I'm sorry. July 8th. September 28th. Oh, September, okay. The following written order explaining the court's rulings, explaining the court's reasoning such as it was, that that wasn't necessary. Okay. All right. Thank you. Unless the, unless the court has any further questions, I'll conclude. Let's save some time for your rebuff. Save some time for your rebuff. Thank you. All right. Good morning. May it please the court and counsel, James Nellie on behalf of Thomas O'Donnell. Unlike the appellant here, I believe the facts or the lack of facts in this case are very important. This is a case where this action was instituted. Four different complaints were filed. Four different complaints. The first one was withdrawn voluntarily in the face of a motion to dismiss, given leave to replead. The second one was dismissed. The third one was dismissed. And only the fourth one, where this magical paragraph 46 suddenly appeared, was allowed to go forward. I think it's very important to look at this in the context of what type of case this is. This is a defamation case. Defamation is, the Green case teaches us, must be plied with precision and with detail. I'd like to just interrupt you one second. You said there was four different complaints, but isn't it a fact that all the complaints were virtually the same, except for the last one? Correct. Correct. And none of the initial complaints contained any allegation about who addressed envelopes. It was devoid. When the second complaint was dismissed in January of 2013, the court admonished counsel to be very careful. I'm going to let you replead, but be very careful and make sure that you have enough here to meet the defamation standard. Interestingly, they brought in three different defendants, three additional defendants, who were ultimately dismissed out. We're aware of those things, but what I would like to know is, in the deposition of the witness, did the witness testify that he wasn't retained until after the complaint was filed? Did he ever say that? He didn't say that, but the interesting thing is – Did anybody ever ask him that question? I don't know that that question was asked, honestly, Your Honor. I'm not certain. But the interesting thing is this. When he made his report, in his deposition testimony – Did anybody ask him whether he gave counsel an oral report? Yes, and they were asking his deposition, and he said, I – it's page 56 to 58 of the deposition, I'm not sure of the record site. They asked him about that, and he says, I only do forensic written reports. That's how I report my findings to people. I don't give informal opinions. I don't give letter opinions. So in his testimony, in the record 704-705, the ASTM standards, which are the standards that apply to the forensic document examiners, my colleague, Mr. Carbonell, asked him a question. And did you use the word – using the terms of the ASTM standards, quote, evidence falls far short of what necessary to support a definite conclusion in the rendering of your opinion in this case? And the answer from the witness was, no, I did not. So applying the standard that the expert applied, he never said that there was any chance of saying, Mr. O'Donnell is the person who wrote this. And I want to go back to the pleadings because I think this is important. The first three complaints don't talk about the envelopes or who addressed them or anything. When they were dismissed time after time because they lacked the specificity to meet the standard for defamation filing, and the plaintiffs were warned, you know, hey, make sure you got something before you come back with another complaint. When they answered the complaint to dismiss the second amended complaint, they appended a proposed third amended complaint. And in there they had a paragraph 40. And that paragraph 40 in that document was a statement on information and belief Thomas O'Donnell may have written the envelopes. And that was then their complaint was in fact dismissed and they were given leave to replete one more time. And then in paragraph 46, someone appears out of nowhere in the final complaint where for the first time they say, based upon handwriting analysis of the handwritten envelopes used to mail the November 2011 and February 2011 letters, O'Donnell addressed the envelopes and mailed the letters. That was a statement of fact. It wasn't on information and belief. So that had morphed from the time that the third complaint was dismissed and this proposed third amended complaint which was appended to the answer was presented to the court. And how long did they know about these envelopes? The envelopes, the incidents involved, the letters involved went out in the years 2011. So, you know, they knew about this for over a year before suit was even filed. Suit wasn't filed until I believe June of 2012. And a couple of letters. Did the expert tell you how many samples he had of the handwriting? He did. And the interesting thing was he was critical. He never actually had any original documents. He never saw the original envelopes. He saw photocopies of the envelopes. He never saw an original handwriting example of Mr. O'Donnell. Did he say he needed to see that? He actually said yes, that the evidence given to him was not the type of evidence where he could reach a conclusive opinion. We had an expert witness who was deposed. He made a point of having Mr. O'Donnell come to his office and give exemplars of his handwriting while he watched him give those exemplars. And he also made it a point to have original documents, the original letters requested from the plaintiffs and provided to our expert. So, yes, it's very important to look at original documents. All the forensic document examiners and the SDM standards say that. So he never had any of that. So was he ever asked why he didn't have the originals or why he wasn't provided the originals? He just said the attorneys provided me this and they told me. The other thing is he did not even know what served me, what was identified to him as examples of Mr. O'Donnell's handwriting. He said he did not know. He had no personal knowledge or independent basis to say if they were. He said the attorney told me it was Mr. O'Donnell, so that's what I went on. So he wasn't provided any of that information. So, and the interesting thing is if you look at the affidavit that Mr. Gibbons submitted in response to the sanctions proceedings, he talked about, you know, well, I retained an expert. I did this. There's no evidence in the record that either any of the plaintiffs ever spoke with the expert. As far as the record shows, the expert was retained by the attorneys and any communication was between attorneys and expert. So Mr. Gibbons talking about knowing this because he retained an expert is not accurate. He never talked to the expert. Mr. Gibbons never saw the expert. Why, did the expert testify to that in his deposition that he never talked to Mr. Gibbons? He testified that his contact was only through the attorneys. And nobody asked if he ever talked to Mr. Gibbons. That's correct. The only evidence in the record is that his only contact was through the attorneys and documents provided through the attorneys. As far as the proceedings go, I want to address a couple of other things. There was plenty of evidence in the record. Judge Brewer wrote a seven-page written order in addition to the orders entering the sanctions and quantifying the amount after evidentiary hearings. There was a hearing in July. There was a hearing in September. And both parties were allowed to present whatever evidence they wanted. Counsel presented affidavits from his clients. We presented the sworn testimony of Mr. Welch to his deposition. So there was plenty of evidence in the record. So you're saying there was an evidentiary hearing? Correct. Correct. And the other thing is, plaintiffs never asked for any additional proceedings. They never said, we want to bring Mr. Welch in live to testify about what went on in his analysis or what he told us. Was there a court order present at the time? There was not. There was not. I think what's important here is that the plaintiffs were put on notice by the court saying, you know, this is a defamation case. You've got to plead with precision. And after multiple complaints were dismissed, suddenly the proposed Third Amendment complaint has this paragraph 40 on information and belief Thomas O'Donnell wrote these envelopes. But then by the time the actual Third Amendment complaint is filed, that morphs into a statement of fact. The handwriting analysis proves that Thomas O'Donnell wrote these envelopes and mailed them. It's patently false. They never had any evidence to that effect. The written report that the expert said, when I report my findings, I do so in a written forensic report. That report came out in February of 2014, which was 10 months after the Third Amendment complaint with the statement of fact that handwriting analysis proved Thomas O'Donnell wrote these envelopes had been pled. That was in April of 2013. So you have a 10-month gap before this report comes out. And the deposition of the expert was consistent in saying, no, I never said conclusively. In fact, the evidence false, the ASTM standard that he said he applied to his finding here was that the evidence falls far short of that necessary to support a definite conclusion. Far short. This was never here to begin with. There was never a case here. It was dismissed multiple times. And the only way, and when Judge Brewer dismissed the three other defendants from the Third Amendment complaint and dismissed eight of the nine counts of the Third Amendment complaint, she specifically stated, the only reason I have to leave Mr. O'Donnell in here is because there is a specific factual pleading in paragraph 46 that there is handwriting forensic expert evidence that this man wrote the envelopes. That's why we went through another two and a half years of litigation. That's why sanctions are proper here. This was imposed for an improper purpose and without a foundation in fact. The other issue I'd like to address briefly is the summary judgment. That was entered in the same order where the court said, I'm denying the motion for summary judgment, but I'm granting the motion to voluntarily dismiss. Plaintiffs came in four days before the trial date in 2005 and said, we're just voluntarily dismissing the case. And in that same order. So it was just cleaning up the record. You know, I'm going to deny the summary judgment because the case is being voluntarily dismissed. There's no reason to enter summary judgment. They're voluntarily dismissing. And I will point out, the plaintiffs voluntarily dismissed with prejudice. With prejudice. They knew that this was a bad pleading. They knew they were never going to be able to prove this case. So unlike a normal voluntary dismissal where you would leave the door open to re-plead for another year if you thought you could, they were well aware at that point, hey, we're four days from trial, we can't prove anything here. We're going to voluntarily dismiss and we'll do it with prejudice because we know that there's nothing to this case. So, again, the standard here is a very high one. It's did the circuit court abuse its discretion? Judge Brewer was the judge who had this case from its inception, who solved multiple complaints, who admonished the plaintiffs many times, make sure you know what you're doing. I'll let you re-plead, but make sure you have something to this case. She was well aware of the history. And she was also well aware that the only reason it went on solely against Mr. O'Donnell for two and a half years after that was because they magically had this paragraph 46 appear saying that Mr. O'Donnell wrote the envelopes. Statement of fact. Not an information in belief. Not that he may have. Not that we think he did. Mr. O'Donnell wrote the envelopes. We have scientific evidence telling us that. And when the proof was in the podium, when the report came out, when the expert deposition was given, none of that was there. We have to, people are allowed to go to court to resolve legitimate disputes. They cannot abuse the process to use it to harass people and to file false claims and to file fraudulent claims. She was well aware of that. So I think it's very important for the integrity of the process that this award of sanctions stand. I have a question with regards to the orders that were issued in July 8, 2015, and then also September 28, 2015. Earlier in the oral argument, a counselor indicated that the reason there was no transcript of the bystander's report with regards to what happened on July 8th is because the order that was issued by the trial court on September 28th clearly felt like everything that happened on July 8th. Well, there was extensive argument, extensive citation to the evidence in the record. I think the court order of September 28th gave a good summary. But, you know, there wasn't a court report at present, and nobody requested a bystander report. If there are no further questions, then thank you for your attention. All right, rebuttal. Yes, sir. I'll be brief. Counsel, Eppley said that there was an evidentiary hearing. And you say there wasn't an evidentiary hearing. And he says that he even put on a witness. Did he put on a witness? He did not put on a witness. There were measures. So the record is not going to show me that there was a witness put on, because, you know, now you're putting yourself where you can get sanctions from the appellate court, and my sanctions will be higher than that of the circuit court. So I'm going to give you the opportunity. I want to know the truth. The truth is there was no witness that testified at the hearing on July 8th. There were motions. There was a motion for sanction. There was a response brief, and there was a reply brief. In our response brief, we had an affidavit. I'm not sure if in their motion they had, what they had, as I recall, was, and the record will show this, that in their motion they had the deposition testimony of Mr. Welch. Mr. Welch did not testify. Mr. O'Donnell did not testify. No one appeared in court, was sworn under oath, and was questioned by the court or was questioned by counsel. That's it. This is just an oral argument based on response pleadings on July 8th. Actually, at no time, either on July 28th, either. July, I'm sorry, September 28th. September 28th, there was no witnesses. It was essentially a hearing on fees where the counsel for the defendant submitted a fee affidavit, and we argued some points related to the fee affidavit, and the court concluded, actually reduced the amount sought by some number. So even there, there was no testimony. I would like to disagree respectfully with opposing counsel when he says that the ruling on summary judgment was simply cleaning up the record. That is not the case. This was a full, on April 27th, 2015, not long before the trial was scheduled, they brought a motion for summary judgment based on the same issues here in this petition for sanctions, and there was a full argument, affidavits and argument and a ruling by Judge Brennan that, I'm sorry, Judge Brewer, that the motion for summary judgment would be denied, and then, and only at that point, was the question of voluntary dismissal taken up. As the court knows, in the 1009 voluntary dismissal provision in the code, courts can entertain dispositive motions before ruling on voluntary dismissal. That's what happened. Now, with respect to the voluntary dismissal, counsel simply is leaving out the vital fact here as to why the case was dismissed. The case was dismissed because the plaintiff, Garrett Fitzgerald, who was vital to the case, was gravely ill. He had a cancer or a brain tumor and passed away about 10 days later. It was clear at that point that he was so sick that he would not be able to participate in the trial, and so that was the motivating reason for the plaintiff to voluntarily dismiss. Counsel simply didn't tell you that, but that was the reason the case was voluntarily dismissed, and there was a full hearing on the- That was in the briefs, so we're fairly aware of that. I mean, you could tell us that this pencil is an elephant, but we really know it's a pencil. Go ahead. With that, Your Honor, I will conclude my argument. Okay. Thank you. Thank you. All right. May I be heard? For one second, you could be heard. Okay. As to one item, you said that you presented testimony. Yes. Counsel- Through the deposition of his- Oh, you didn't say through a deposition. No, I said the witness testimony, the deposition. We did not present- You didn't represent live testimony. I want to clarify the record on that. Okay. It was a deposition testimony, and I also said- All right. That's the extent you could be heard. Okay. You've already argued. I want you to know that Justice Lamkin could not be here today, but she will hear the tapes of this argument, and she will participate with us in our decision-making process. We will take this case under advisement, and we're going to take a short recess now before the next case. The court will be temporarily adjourned.